UNITED STATES of America,
Plaintiff–Appellant,

v.

Kenneth Charles ROGERS,
Defendant–Appellee.

No. 04–4048.

United States Court of Appeals,
Tenth Circuit.

Dec. 17, 2004.

**1166**

Diana Hagen, Assistant United States Attorney, District of Utah (Paul M. Warner, United States Attorney, District of Utah, Wayne T. Dance, Assistant United States Attorney, Chief, Appellate Section, on the brief), Salt Lake City, UT, for Plaintiff–Appellant.

Michael J. Boyle, Boyle & Drage, Ogden, UT, for Defendant–Appellee.

Before SEYMOUR, MURPHY, and McCONNELL, Circuit Judges.

MURPHY, Circuit Judge.

## I. INTRODUCTION

A federal grand jury indicted Kenneth Charles Rogers on one count of possessing a firearm while subject to a domestic protection order, in violation of 18 U.S.C. § 922(g)(8), and one count of possessing a firearm following a misdemeanor conviction of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Officers discovered the existence of the firearms underlying these charges during a visit to Rogers' home to serve a domestic protective order. Rogers filed a motion to suppress the weapons and the statements he made to the officers regarding the weapons, contending that the actions of the officers violated his rights under the Fourth and Fifth Amendments to the United States Constitution. The district court suppressed the weapons and statements as fruits of a custodial interrogation obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States appeals the district court's suppression order, asserting as follows: (1) the district court erred in ruling that Rogers was in custody for purposes of *Miranda*; (2) even assuming Rogers was in custody, the officers' questions regarding the presence of weapons falls within the public-safety exception to *Miranda*; and (3) even assuming there was a *Miranda* violation, the district court erred in suppressing the weapons, rather than merely suppressing Rogers' statements to the officers. Exercising jurisdiction pursuant to 18 U.S.C. § 3731, this court **reverses** the district court's order of suppression and **remands** the case to the district court for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Factual Background

On February 4, 2003, Cheryl McGuire approached Officer Gary Litster of the Centerville Police Department for assistance in safely removing her possessions from a residence she shared with Rogers. McGuire told Officer Litster that Rogers had been verbally abusive to her and her children, that Rogers had previously been convicted of domestic violence, and that she was afraid Rogers might try to harm her as she moved out of the shared residence. Officer Litster conferred with Lieutenant Paul Childs. Lieutenant Childs confirmed that Rogers had a history of domestic violence and aggravated assault. Lieutenant Childs also indicated that several firearms had been seized from Rogers as a result of a previous arrest, but that the firearms had ultimately been returned to Rogers. Officer Litster then advised McGuire to obtain an *ex parte* protective order before proceeding to move her possessions from the residence she shared with Rogers. Officer Litster indicated that once she had received such an order, he would assist her in "keeping the peace" as she removed her items from the residence.

After McGuire had obtained an *ex parte* protective order, Officer Litster and Deputy Sheriff Ray Prochet of the Davis County Sheriff's Office went to Rogers' home to serve the order. One of Deputy Prochet's primary responsibilities with the Davis County Sheriff's Office was to serve such orders. Officers James Woods and Rob Kirkham of the Centerville Police Department also went to the residence to serve as a safety backup. They initially waited about one block away, out of sight of the residence, while Officer Litster and Deputy Prochet served the protective order. McGuire and her movers also waited about one block away from the residence, until receiving approval from the officers to start removing McGuire's property from the residence.

Officer Litster and Deputy Prochet went to the door of the residence; Deputy Prochet both rang the doorbell and knocked on the door. Rogers, who was home sick, answered the door in his bathrobe. The officers informed Rogers that the purpose of their visit was to serve him with an *ex parte* protective order and to conduct a "civil standby" while McGuire removed her personal belongings from the residence. Although the parties dispute what happened next, the district court found that, because it was snowing and cold outside, Rogers invited the officers through the doorway of the residence. Deputy Prochet then read the protective order aloud to Rogers and effected service of process. Deputy Prochet also informed Rogers that the protective order authorized McGuire to remove her personal belongings from the residence and that the officers would assist in keeping the peace. Officer Litster then asked Rogers if there were any weapons present in the residence. When Rogers replied in the affirmative, Officer Litster asked Rogers where the weapons were located. Officer Litster then asked Rogers if he would show him the weapons; Rogers indicated that he would and took Officer Litster to a room at the back of the residence. Officer Litster observed a case for a shotgun-type gun and a case for a handgun in the room. When Officer Litster asked Rogers if there were guns in the cases, Rogers responded that there was a shotgun in one case and a handgun in the other.

Officer Litster asked Rogers if he could have the key to the room so he could secure the firearms while McGuire removed her property from the residence. When Rogers gave him the key, Officer Litster stated he would return the key to

Rogers when McGuire was finished with the move. Rogers then retired to his bedroom for the duration of the move; officers returned the key to Rogers when that process was complete.

Shortly after this incident, Officer Litster contacted Agent Larry Marx of the Bureau of Alcohol, Tobacco and Firearms regarding what he had heard and observed at Rogers' residence. Agent Marx used this information to obtain a federal search warrant for Rogers' residence, which was executed on February 14, 2003. After the execution of the warrant, Rogers was arrested on charges of possessing firearms in violation of 18 U.S.C. § 922(g)(8) and (g)(9).

## B. Procedural History

In response to the indictment on the weapons charges, Rogers filed a motion to suppress. In his motion, Rogers alleged that both the firearms and the statements he made to the officers regarding the firearms had to be suppressed because: (1) the initial entry into his home by the officers was without his consent, and thereby violated his rights under the Fourth Amendment; (2) his responses to Officer Litster's questions about the presence of weapons were obtained in violation of *Miranda*; and (3) the officers' further entry into the residence to secure the room where the weapons were stored constituted a further unlawful search and seizure in violation of the Fourth Amendment. The district court rejected Rogers' first contention, granted the motion to suppress based on Rogers' second contention, and, having suppressed the weapons and Rogers' statements on the basis of an alleged *Miranda* violation, declined to address Rogers' third contention.

The district court specifically rejected Rogers' assertion that the officers' initial entry into the residence was in violation of the Fourth Amendment. The district court found, as a matter of fact, that Rogers had invited the officers through the doorway of the residence.[1] Because the officers' entry into the threshold of the home was consensual, the district court concluded that the Fourth Amendment was not implicated.

The district court nevertheless concluded that Rogers was in custody for *Miranda* purposes during the entirety of the encounter with the officers and that, because the officers had not given Rogers *Miranda* warnings, the firearms and Rogers' statements regarding the firearms had to be suppressed. In reaching this conclusion, the district court began by noting

---

1. The district court made the following findings in this regard:

Because of the material differences in the versions of what occurred between law enforcement officers and [Rogers] during the initial encounter, the Court must make a credibility determination to resolve this issue. The Court finds, after observation of the witnesses and consideration of the context and motivation of their testimony, that the testimony of the law enforcement officers is more believable than that of [Rogers] on this issue. The testimony of all of the witnesses in this case illustrates what appears to be a cordial interaction between the law enforcement officers and [Rogers] throughout their interaction that day.

There is no allegation of raised voices or intimidating behavior on the part of the law enforcement officers. Also, given the fact that it was snowing outside, it is reasonable that [Rogers] voluntarily invited the officers inside of the threshold of the residence for the purpose of discussing the *ex parte* protective order that the officers had indicated they intended to serve upon [Rogers]. Given the totality of the circumstances in this case, the Court finds that the law enforcement officers' initial entry into the threshold of the residence was authorized by the consent of [Rogers]. Therefore, the Fourth Amendment is not implicated in this respect.

Dist. Ct. Order at 6–7.

that the encounter had taken place in Rogers' home. According to the district court, this was significant because "nowhere is 'the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home.'" Dist. Ct. Order at 9 (quoting *Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). With this as the backdrop, the district court concluded as follows:

> The actions of the law enforcement officers from the moment that they crossed the threshold of [Rogers'] home made it clear to [Rogers] that he was not free to leave. As [Rogers] moved throughout his home, he was escorted by Officer Litster. On the witness stand, Officer Litster agreed that [Rogers] "wasn't free to leave and walk to the back[.]" The back bedroom was secured by the officer and [Rogers] was asked to retrieve a key to lock the door. Officer Litster admitted, "I had control over those items, yes." Officer Litster further agreed that [Rogers] "wouldn't be free to leave to go anywhere at that point except right next to [him]." [Rogers] testified that he did not feel "free to roam around the house at that point in time."

> The Court finds unreasonable the government's position that [Rogers] was free to leave at any time. That argument amounts to a position that law enforcement officers may enter an individual's home who, as in this case, is not at that time suspected of engaging in any criminal activity, and expect that individual to leave his or her own residence to avoid the potential custody that may follow. The Court does not view this position as acceptable under the Fourth Amendment. It is not reasonable in the eyes of the Court for the burden to shift to an individual in his

own home to escape in order to avoid detention.

Dist. Ct. Order at 10–11.

Having concluded that the actions of the officers violated Rogers' *Miranda* rights, and that suppression of both Rogers' statements and the guns was the appropriate remedy, the district court declined to address Rogers' remaining argument that the law enforcement officers' continued and expanded entry into his home and temporary seizure of his guns constituted an unreasonable search and seizure under the Fourth Amendment.

## III. DISCUSSION

◾ "It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir.1998) (quotation omitted). Instead, the protections set out by the Supreme Court in *Miranda* only apply when an individual is subject to "custodial interrogation." *Miranda*, 384 U.S. at 439, 86 S.Ct. 1602. A person is not "in custody" for *Miranda* purposes unless his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quotation omitted). The "in custody" determination is based on how a reasonable person would understand the situation. *Id.* at 442, 104 S.Ct. 3138. This reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Erving L.*, 147 F.3d at 1247. This court reviews the district court's "ultimate 'in custody' determination *de novo*, with proper deference to the district court's findings of historical fact and credibility determinations." *Id.* at 1246.

■ Upon *de novo* review, this court concludes that a reasonable person in Rogers' position would not have felt, at the time Litster asked the questions about the presence and location of the weapons, that his freedom of action was restrained to a degree associated with formal arrest. *See Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138. In reaching a contrary conclusion, the district court made three critical errors: (1) it failed to adequately consider the totality of the circumstances, instead focusing narrowly on the fact that the encounter took place in Rogers' residence; (2) it improperly relied on the subjective impressions of Rogers and the officers in reaching its "in custody" conclusion; and (3) it improperly relied on events which occurred after the officers asked Rogers about the firearms to determine whether Rogers was in custody at the time the questions were asked.

A consideration of the totality of the circumstances surrounding Officer Litster's questions to Rogers about the presence of weapons in the home and the location of those weapons demonstrates that no reasonable person in Rogers' situation would have felt that his freedom of action was restrained to a degree associated with formal arrest. The district court felt it was significant to the "in custody" determination that Rogers "was approached in the sanctity of his own home." Dist. Ct. Order at 9. According to the district court, the government's position that Rogers was not in custody at the time of the questioning because he was free to leave "amounts to a position that law enforcement officers may enter an individual's home who, as in this case, is not at that time suspected of engaging in any criminal activity, and expect that individual to leave his or her own residence to avoid the potential custody that may follow." *Id.* at 11. The district court's analysis misses the mark.

The officers did not pick Rogers' house at random, enter without consent, and begin asking Rogers questions. Instead, the officers approached a home that until recently had been shared by Rogers and McGuire. The officers knocked on the door of the residence and, after Rogers answered the door, explained that they were there to serve an *ex parte* protective order and conduct a civil standby while McGuire removed her belongings from the home. At that point Rogers invited the officers through the doorway of his home. The district court specifically found that the interaction between Rogers and the officers was "cordial," and that the officers never raised their voices or exhibited any intimidating behavior. After the officers had finished reading the protective order to Rogers, they explained that they would remain present while McGuire removed her belongings and that, by the terms of the order, Rogers had to remain separated from McGuire during the move. At that point, Officer Litster asked Rogers if any weapons were present in the home. When Rogers indicated firearms were present, Officer Litster asked where the firearms were located; Rogers responded that the firearms were in a back bedroom.

This court can find nothing in this sequence of events that would lead an ordinary person to believe he was under arrest at the time Officer Litster asked the questions about the presence and location of weapons. Contrary to the district court's conclusion, the fact that the encounter took place in Rogers' home does not weigh in favor of concluding he was in custody. *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir.1994) (" '[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." (quoting 1 W. LaFave, *Criminal Procedure*, § 6.6(e), at 496 (1984 & 1991 supp.))). The officers were

courteous and non-threatening throughout this sequence. *Erving L.*, 147 F.3d at 1248 (noting that courteous and non-threatening nature of police actions weighed against a conclusion the defendant was in custody); *Ritchie*, 35 F.3d at 1485 (noting that a lack of force or threat of force weighed against a conclusion the defendant was in custody). Finally, although the protective order made clear that Rogers' freedom of movement was somewhat limited in order to separate Rogers and McGuire as she was removing her property, those limitations certainly did not rise to a level associated with formal arrest. *See United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir.2000) (noting that even if an individual is seized for purposes of the Fourth Amendment, the individual is not necessarily in custody for *Miranda* purposes). No reasonable person in Rogers' position would have felt that his freedom of action was limited to a degree associated with formal arrest at the time Officer Litster asked about the presence and location of any weapons in the home.

In concluding that Rogers was in custody for *Miranda* purposes, the district court appears to have given substantial weight to the subjective impressions of both Rogers and Officer Litster. The district court specifically identified Rogers' testimony that he did not feel "free to roam around the house at that point in

time," and Officer Litster's testimony that he would not have allowed Rogers to roam around the house unescorted. Dist. Ct. Order at 10. The Supreme Court has made clear, however, that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Thus, the district court erred in relying on the unstated subjective intentions and feelings of Officer Litster and Rogers in reaching its custody determination.[2]

As a final matter, this court notes that in concluding Rogers was in custody for *Miranda* purposes, the district court relied on events which occurred after Rogers was asked about the presence and location of any firearms in the residence. The district court specifically noted that Officer Litster escorted Rogers as he moved about the residence and that Officer Litster secured the room in which the firearms were located. Officer Litster did not request the key to the back room until after Rogers had already indicated that firearms were present in the room. Likewise, it was well after Rogers had been questioned about the presence and location of the firearms when officers escorted him from his bedroom to a different room while

---

2. The district court's reliance on Rogers' testimony is particularly misplaced. Defense counsel asked Rogers the following question: "And at the time that they were there and told you to go into the bedroom, did you feel you were free to roam around the house at that point in time." Rogers responded as follows: "No. I was being directed towards the bedroom, to go in there and stay there." It must first be noted that this testimony relates to a point in time in the encounter after Rogers had been asked about the presence and location of firearms. For those reasons set out below, this testimony is not relevant to the

question whether Rogers was in custody at the time Officer Litster asked Rogers about the presence and location of the firearms. In addition, as noted above, the protective order by its very terms prevented Rogers from being in the same room as McGuire. Thus, Rogers was quite correct to conclude that he could not roam around the house at will while McGuire removed her property. For those reasons set out above, however, no reasonable person would have concluded that these limitations on movement rose to the level of a restraint on freedom of action associated with formal arrest.

**1172**

McGuire retrieved her personal belongings from the bedroom.[3] Although these events might well bear on the question whether the encounter between Rogers and the officers evolved into custody at some later point, we fail to see how they relate at all to the question whether Rogers was in custody when Officer Litster asked about the presence and location of any firearms in the residence. The district court erred in relying on these events to conclude that Rogers was in custody at the time he was interrogated about the presence and location of weapons.

For this same reason, the district court erred in relying on the presence of the two additional officers at the residence in support of its conclusion that Rogers was in custody for *Miranda* purposes from the minute the officers finished reading Rogers the protective order. *See* Dist. Ct. Order at 3 (":Prior to contact being made between [Rogers] and law enforcement officers, there were at least four law enforcement officers present outside the residence...."). There is absolutely no indication in the record that Rogers was aware of the presence of the two additional officers at the time he was asked about the presence of the weapons.

## IV. CONCLUSION

Upon *de novo* review, and with proper deference to the district court's findings of fact and credibility determinations, this court concludes that a reasonable person in Rogers' position would not have believed his freedom of action was restricted to a degree consistent with formal arrest at the time he was asked about the presence and location of firearms in the residence. Accordingly, the district court's order of suppression is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

---

**3.** It is true that Officer Litster accompanied Rogers to the back room where the guns were located. This event occurred after Officer Litster had asked about the presence and location of any firearms in the residence, but before Officer Litster asked Rogers if there were guns in the gun cases in the room. After Rogers indicated that guns were present in the home, Officer Litster asked Rogers to show him where the guns were located. Rogers testified that he responded by indicating, "okay, come on." Rogers then led Officer Litster down a hallway and pointed into the room where the guns were located. In the context of the totality of the circumstances of this case, we simply cannot conclude that Officer Litster's act of accompanying Rogers down the hallway to the room containing the guns constituted a restraint on Rogers' freedom to a degree associated with formal arrest.